IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HANS J. RAPOLD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 08 C 7369 |
| v. | ) |
| | ) The Honorable William J. Hibbler |
| BAXTER INTERNATIONAL, INC., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

When a prospective employment relationship between Hans Rapold and Baxter International, Inc. failed, Rapold sued Baxter. Rapold raises a variety of claims related to the dissolution of the parties' relationship. Baxter moves for summary judgment.

### I. Factual Background

Baxter is a global diversified healthcare company headquartered in Deerfield, Illinois. (Def. Am. St. ¶ 1). As its primary business, Baxter develops and manufactures healthcare products. (Def. Am. St. ¶ 1). In 2004, Baxter launched a new business it called Cellular Therapies (CT), focused on developing therapies based on stem cells and other cellular research. (Def. Am. St. ¶ 3). In January 2007, the Cellular Therapies Department became part of the Bioscience Division. (Def. St. ¶ 9). Andrea Hunt served as the Vice President of the CT Department. (Def. St. ¶ 8). Hunt reported to Ronald Lloyd, the Vice President and General Manager of Regenerative Medicine, and Hartmut Ehrlich, the Vice President of Global Research and Development for Baxter's Bioscience Division. (Def. St. ¶ 10).

In late 2004, Baxter learned that a consultant it had hired for the position of CT Medical Director would be unable to relocate from Boston to Deerfield. (Def. St. ¶ 13). Consequently, Baxter began a search for a Medical Director who could relocate to Baxter's offices. (Def. St. ¶ 13). Rapold, a Swiss and Belgian national who resided in Germany, became a candidate for the CT Medical Director in 2006. (Def. St. ¶ 14). At the time, Rapold performed consulting work and also worked for the University of Basel, although the CT Medical Director's position at Baxter would have provided more stable and greater income. (Rapold Dep. at 173).

Hunt twice interviewed Rapold via video conference in 2006, stressing the importance of the CT Medical Director's role in building a team. (Rapold Dep. at 79, 83). Shortly after Hunt's preliminary interviews, Rapold interviewed with multiple CT team members at Baxter's Deerfield office. (Def. St. ¶ 17). Rapold impressed the team members, particularly with his connection to European cardiologists and experience before the FDA and EMEA (the European drug regulating authority), which would regulate therapies developed by the CT Department. (Def. St. ¶ 18). As a result, Hunt offered Rapold the position as CT Medical Director. (Rapold Dep. at 84).

Baxter sent Rapold an employment agreement in December 2006. (Def. St. ¶ 19). The agreement informed Rapold that the offer of employment was conditioned upon his securing a visa. (Rapold Dep., Ex. 1). The agreement also informed Rapold that his employment would be at will. (Rapold Dep., Ex. 1). Although Rapold signed the agreement the day after he received it, he asked Baxter's Chief Scientific Officer, Norbert Riedel, about the at-will clause. (Rapold Dep. at 81-82). According to Rapold, Riedel assured him that even if Baxter discontinued the project Rapold worked on, Baxter would continue to employ him. (Rapold Dep. at 81-82).

Shortly thereafter, Rapold began the O-1 visa application process. (Def. St. ¶ 20). Baxter provided support, both from its international assignment group and from an outside immigration attorney, to help Rapold navigate the visa application process. (Rapold Dep. at 88-90; Parro Dep. at 22). Because Baxter wished to have the CT Medical Director in place as soon as possible, it asked Rapold to work as a consultant with its Swiss arm, Baxter Healthcare S.A. ("Baxter SA"). (Rapold Dep. at 95-96). Rapold and Baxter SA thus entered into a consulting agreement that had a four-month term, running from January, 2 2007 to April 30, 2007, though the agreement could be extended up to three years. (Rapold Dep., Ex. 2). Rapold understood that the consulting agreement was a "stop-gap" measure that would allow him to perform some of the work of the CT Medical Director until he obtained his visa. (Rapold Dep. at 95-96).

The consulting agreement identified the services that Rapold would provide for Baxter SA, among which were to "provide Medical Director leadership advice for Baxter's Cellular Therapies Business" and to direct "all medical affairs functions of the Cellular Therapies business." (Rapold Dep. at Ex. 2 at Schedule 1). The consulting agreement also required Rapold to abide by Baxter's Shared Values and Standard for Business Ethics. (Rapold Dep. at Ex. 2). Even though Baxter SA and not Baxter was the party to the consulting agreement, Rapold reported directly to Hunt during the term of the consulting agreement. (Def. St. ¶ 27).

Shortly after Rapold and Baxter SA entered into the consulting agreement, employees in Baxter's international assignment group complained about Rapold's behavior. (Parro Dep. at 22-25; Hunt Dep. at 74-77). Elizabeth Nicolay and Patricia Wilkins complained to Hunt and also Human Resources Director Christine Parro that in their conversations with Rapold, he had been rude, condescending, and obstinate. (Parro Dep. at 22-25; Hunt Dep. at 74-77). Nicolay and Wilkins

3

further alleged that Rapold had raised his voice towards them. (Parro Dep. at 22-25; Hunt Dep. at 74-77). Nicolay and Wilkins also both reported that Rapold sometimes refused to produce documents needed to complete his visa application, for example insisting that he needed to submit only two references when Baxter's lawyers requested three. (Parro Dep. at 22-25; Hunt Dep. at 74-77). Although Nicolay and Wilkins complained about Rapold, they did not file a formal complaint and neither Hunt nor Parro opened a file regarding these incidents of misconduct. (Parro Dep. at 80; Hunt Dep. at 78).

While Rapold awaited the processing of his visa, he began to work with the CT team. The CT team leadership conducted weekly meetings in which Rapold participated by teleconference. (Def. St. ¶ 29-30). Rapold used Skype to connect to these meetings, but his calls were dropped on a few occasions. (Rapold Dep. at 128-29). As a result, Hunt requested, both in writing and verbally, that Rapold use a telephone with a speaker function so that the meetings would not be disrupted. (Rapold Dep. at 129-30 & Ex. 5). Rapold never complied with Hunt's request because he believed that a telephone with a speaker function would have made the problem worse. (Rapold Dep. at 129-30).

In February 2007, Rapold had a confrontation with Paroo Uppal, a Senior Director within the CT Department. (Uppal Dep. at 5, 57-61). In preparation for a weekly teleconference, Uppal had modified slides given to her by Rapold so that they were more legible. (Uppal Dep. at 58-61). According to Uppal, Rapold shouted at her because she had changed the slides. (Uppal Dep. at 58-59). Uppal believed that Rapold had been so upset that he hung up on her. (Uppal Dep. at 58-59). After the confrontation with Rapold, Uppal reported the incident to Hunt, seeking clarification on whether to send out the modified version of the slides. (Uppal Dep. at 61). Uppal informed Hunt

4

that Rapold had shouted at her and hung up on her. (Uppal Dep. at 61). Later in February, Uppal received an e-mail that Rapold had sent to an external doctor that she believed discredited her. (Uppal Dep. at 100-101). Uppal reported Rapold's e-mail to Hunt and responded to Rapold, asking him not to discredit her to external physicians but rather to keep disputes within Baxter. (Uppal Dep. at 101).

Also in February 2007, Rapold traveled to Toronto, Ontario to meet members of the CT Department. (Def. St. ¶ 36). At the meetings, Rapold shouted at another Baxter employee, Lorna Williams. (Williams Dep. at 41-44; Uppal Dep. at 92-93; Hunt Dep. at 28-30). According to Williams, Rapold yelled at her about Baxter's process regarding its clinical trials. (Williams Dep. at 41). Williams and Uppal testified that Rapold yelled at Williams for 15-20 minutes. (Williams Dep. at 41-44; Uppal Dep. at 92-93). A third Baxter employee, David Amrani, observed Rapold yelling at Williams, and attempted to defuse the situation. (Hunt Dep. at 29-30). Rapold admits that he raised his voice at Williams, but explained in an email to Hunt that his behavior was due to fatigue from jetlag and frustration over the loss of his personal laptop. (Rapold Dep. at 61-63 & Ex. 6). Williams, Uppal, and Amrani all reported Rapold's outburst to Hunt. (Williams Dep. at 41-44; Uppal Dep. at 92-93; Hunt Dep. at 28-30). In an email to Amrani, Hunt confirmed that although Rapold had productive meetings with other CT team members, his treatment of Williams and Uppal was rude and unacceptable. (Hunt Dep. at Ex. 2).

In response to Rapold's behavior in Toronto, Hunt met with Parro to discuss a plan to help Rapold modify his behavior so that he could succeed at Baxter. (Def. St. ¶¶ 45-46). Hunt sent Parro a memorandum outlining areas that would impact Rapold's ability to perform the role of CT Medical Director. (Def. St. ¶ 46, Hunt Dep. at Ex. 3). Included in the memorandum's topics, among other

things, were: a) willingness to accept Baxter's standard policies and procedures; b) adherence to project time lines; c) willingness to operate within the context of a team; d) respect for other members of the team; and e) willingness to take direction from supervisors. (Hunt Dep. at Ex. 3). The memorandum recognized that Rapold might not be familiar with Baxter's corporate culture and that Baxter may need to address "European cultural differences." (Hunt Dep. at Ex. 3).

Over the next couple of months, Hunt worked with Rapold to modify the behavior that Baxter employees had found problematic. (Def. St. ¶¶ 49-55). For example, Hunt and Parro discussed utilizing Baxter's Chief Scientific Officer, Norbert Riedel, a German national, to "coach" Rapold. (Def. St. ¶ 50). In April 2007, Hunt wrote an email to Parro in which she asserted that Riedel "understands the issues at hand [as well as] the 'German' approach," and expressed hope that Riedel could help Rapold appreciate that Baxter's culture was one centered around "collaboration, teamwork, openness, [and] respect for individuals," rather than one that was an "autocratic, top-down" approach." (Def. St. ¶ 51). Hunt also discussed with Rapold the difference in Baxter's approach, and Rapold offered that the Swiss believed the German management style was too strict or stubborn. (Def. St. ¶ 52). Hunt informed Rapold that multiple persons had informed her that he had been stubborn and difficult to work with and that others had requested to limit their contact with him. (Def. St. ¶ 53). Hunt believed that after such conversations, Rapold's behavior would temporarily improve, but some incident would later "set him off." (Hunt Dep. at 35-36). Hunt cautioned Rapold to avoid yelling or screaming and to refrain from sending angry emails. (Hunt Dep. at Ex. 4).

As the end of April 2007 approached, Rapold had not yet obtained his visa, so Rapold and Baxter extended the consultancy agreement. (Def. St. ¶ 56). Later in April, Baxter did receive his

visa. (Def. St. ¶ 57). Rapold and Baxter agreed that he would start as the CT Medical Director in Deerfield on June 4, 2007. (Def. St. ¶ 56). Parro contacted Baxter's European personnel to determine how best to terminate the consultancy agreement. (Parro Dep. at Ex. 6). Parro made clear that Rapold would begin his employment with Baxter in Deerfield on June 4, 2007, that Baxter wished to pay him all monies owed on the consultancy agreement including the contractually agreed upon 30% bonus, and an additional $45,000 bonus to wrap up the contract. (Parro Dep. at Ex. 6). On May 15, 2007, Parro forwarded Rapold language to include in a termination letter. (Parro Dep. at Ex. 6). On May 16, 2007, Hunt wrote Rapold a similar message. (Hunt Dep. at Ex. 6). Rapold authored a termination letter on May 21, 2007. (Rapold Dep. at Ex. 3).

In the meantime, Rapold traveled to Deerfield to look for a house. (Rapold Dep. at 25). Baxter employed Prudential International Relation to assist Rapold with his search, and Prudential assigned Linda Lincoln to the task. (Def. St. ¶ 62). Rapold left Deerfield on May 20, 2007, without having found a house. (Def. St. ¶ 65). The next day, Nicolay (from Baxter's international assignment group) forwarded Parro an email she had received from a Prudential manager. (Def. St. ¶ 66). The email reported that Rapold had yet another conflict. (Parro Dep. at Ex. 8). Apparently, Lincoln believed that Rapold had been abusive and argumentative during the housing search. (*Id.*). Lincoln had found Rapold an apartment that suited his needs, but Rapold insisted on doing the negotiating himself. (*Id.*) According to Prudential, Rapold got into a fight with the listing broker or owner of the apartment and failed to complete a lease. (*Id.*). Lincoln informed her manager that although Rapold had called to apologize the next day, that she no longer consented to work with him. (*Id.*).

A few days later, Prudential emailed Parro again with more details concerning Rapold's behavior during the housing hunt. (Parro Dep. at Ex. 9). Lincoln claimed that Rapold "absolutely hates America" and "seems to have a vendetta against Baxter" and was intending to "'get back at Baxter' (euphemistically speaking) for what they [sic] did to him." (Parro Dep. at Ex. 9). Shortly thereafter, Hunt and Parro met to discuss Rapold's behavior. (Hunt Dep. at 106-108; Parro Dep. at 114-116). Given Rapold's tendency to berate people "for no good reason" or to "fly off the handle," Hunt expressed concern that Rapold might lose control when before the FDA, jeopardizing Baxter's interests. (Hunt Dep. at 127-128).

On May 22, 2007, Hunt sent an email to Hartmut Ehrlich and Ron Lloyd, two of her supervisors at Baxter, in which she explained her recommendation to withdraw Baxter's offer to Rapold. (Hunt Dep. at Ex. 10). In the email, Hunt recounted the incidents with international assignment and information technology personnel, the incidents with Uppal and Williams, an incident with Ehrlich, and the incident with Lincoln. (Hunt Dep. at Ex. 10). In a teleconference thereafter, Ehrlich and Lloyd agreed with Hunt's recommendation. (Hunt Dep. at 114-115).

On May 25, 2007, Hunt phoned Rapold and informed him that Baxter was withdrawing its offer of employment. (Def. St. ¶ 73). Hunt confirmed the withdrawal in a letter. (Def. St. ¶ 73). Hunt prepared typewritten notes of her conversation with Rapold. (Hunt Dep. at Ex. 11).[1] The notes indicate that Hunt outlined the reasons why Baxter was withdrawing its offer of employment and that

---

[1] Rapold suggests that Hunt prepared the script *prior* to the conversation she had with him in which she fired him, pointing to a date at the top of the page that read 5/18/07. The notes, however, refer to the conversation between Rapold and Hunt, which Rapold admits occurred on May 25, 2007. For example, the notes indicate that Rapold was silent when informed that Baxter was withdrawing its offer of employment and that he later stated it was "unbelievable" and refused to return the Blackberry and computer that Baxter had issued to him. (Hunt Dep. at Ex. 11).

8

Rapold did not accept the decision. (Hunt Dep. at Ex. 11). Later that day, Rapold emailed Hunt, questioning Baxter's decision to withdraw the offer of employment. (Rapold Dep. at Ex. 12).

Five days later, Parro and Hunt had a conference call with Rapold, in which they further discussed the withdrawal of Baxter's offer of employment. (Def. St. ¶ 76). Parro and Hunt discussed with Rapold his difficulty working with Lincoln to find housing. (Rapold Dep. at 184-190). According to Rapold, Parro explained that his behavior demonstrated a "cultural mismatch" and that he would not be able to work within the American business environment. (Rapold Dep. at 190-91). After this conversation, Rapold emailed many Baxter employees, including Riedel, Ehrlich, and Baxter's Chief Executive Officer, complaining of the employment decision. (Rapold Dep. at Exs. 15-22).

After Baxter withdrew its offer of employment to Rapold, it asked Peter Adams, then the Medical Director of the Medical Research and Development Organization within Baxter to run the CT Department's advisory board meetings in Rapold's stead. (Ehrlich Dep. at 81). Baxter later internally hired Adams in 2008 to serve as the CT Medical Director, after utilizing Paul-Andre Gollier and David Perry as acting directors. (Hunt Dep. at 53-54).

## II. Standard of Review

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct., 2548, 91 L.Ed.2d 265 (1986). The moving party bears the initial burden of demonstrating there is no genuine issue of material fact, and judgment as a matter of law should be granted in its favor. Fed.R.Civ.P.

9

56(c). Once the moving party has met the initial burden, the nonmoving party must then "go beyond the pleadings" and "designate specific facts showing that there is a genuine [material] issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmoving party must offer more than a mere scintilla of evidence to survive summary judgment, and conclusory allegations are insufficient to defeat a motion for summary judgment. *Keri v. Bd. of Trustees of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006). *Roger Whitmore's Auto. Servs. v. Lake County, Ill.*, 424 F.3d 659, 667 (7th Cir.2005). During the Court's review, it must view all evidence and inferences in the light most favorable to the nonmoving party. *Id.* at 255.

### III. Analysis

#### A. *Tortious Interference Claims*

In a claim for tortious interference with a contract, a plaintiff must establish: 1) the existence of a valid and enforceable contract; 2) the defendant's awareness of that contract; 3) the defendant's intentional and unjustified inducement of a breach of the contract; 4) a subsequent breach caused by the defendant; and 5) damages. *Dopkeen v. Whitaker* 926 N.E.2d 794, 797 (Ill. App. Ct. 2010). The elements of a tortious interference with a business expectancy are similar. In that claim, a plaintiff must establish: 1) a valid business expectancy; 2) knowledge of that expectancy; 3) intentional interference with the expectancy that prevents it from materializing; and 4) damages. *Jim Mullen Charitable Found. v. World Ability Fed'n, NFP*, 917 N.E.d2d 1098, 1111 (Ill. App. Ct. 2009).

Rapold's arguments in support of his tortious interference claims are flimsy at best. Rapold suggests that Hunt concocted a plan — after months of belligerent behavior on Rapold's part — to terminate him. To effect this plan, Hunt convinced Rapold to terminate his consulting contract with Baxter SA in Europe but then pulled the rug out from him by withdrawing the offer to employ him

10

at Baxter's Deerfield location. In short, Rapold suggests that Hunt played Lucy to his Charlie Brown.

Rapold's arguments depend upon an Everest-sized mountain of unsupported speculation. Rapold's theory first depends upon the proposition that the consultancy agreement with Baxter SA existed separate and distinct from Rapold's offer of employment from Baxter. If it did not, then Baxter did not engage in any unjustified interference with the contract or business relationship. Rapold insists that the consultancy agreement had an origin distinct from his relationship with Baxter, but his argument is not supported by the undisputed facts. First, it is undisputed that Rapold entered into the consultancy agreement one month after coming to terms with Baxter. The agreement identifies the services Rapold would perform as including providing Medical Director leadership advice for Baxter's CT Division and directing the affairs of the CT Division. In other words, the consultancy agreement required Rapold to perform the duties he would perform for Baxter after obtaining a visa. Most importantly, Rapold himself admits that the consultancy agreement existed only as a bridge to enable Rapold to do some of the work of the CT Medical Director while he awaited his visa. When Rapold was asked why he entered into the consulting agreement, he responded that he did so "to be able to fulfill the function I would fill in the U.S. as soon as my visa" was approved. (Rapold Dep. at 95-96). When he was asked if the consultancy was a "stop-gap measure," Rapold responded that "it was understood . . . that at some point we would switch to U.S. employment." (Rapold Dep. at 95). In short, Rapold's argument that the consultancy agreement was an independent contract between him and Baxter SA, and not an agreement tied to his employment with Baxter is but empty speculation.

Next, Rapold's argument hinges almost entirely on speculation regarding Hunt's frame of mind. According to Rapold's theory, Hunt decided to fire him on May 18, 2007 and, over the next few days, remained silent until Rapold himself terminated the consultancy agreement to withdraw Baxter's offer of employment. In constructing this argument, Rapold relies on the notes Hunt prepared concerning the conversation she had with Rapold in which she withdrew Baxter's offer to employ him. Among other things, the notes document the reasons Hunt stated for Baxter's decision and Rapold's reaction to that decision. At the top of the first page of the notes, Hunt typed "5/18/07." Even though Rapold admits that Baxter withdrew its offer of employment on May 25, 2007, he insists that the May 18 date on Hunt's notes proves that she decided to terminate him on May 18. He points to nothing, however, in support of this claim. Instead, the undisputed evidence demonstrates that Hunt received information from Prudential concerning Rapold's behavior towards its agent on May 21 and that as a result of that information Hunt wrote to her supervisors on May 22 to seek approval to withdraw Baxter's offer of employment to Rapold.

Moreover, even if Hunt did prepare an outline of the reasons why Baxter would withdraw its offer of employment on May 18, the mere fact that Hunt outlined the reasons for Baxter's decision prior to informing Rapold of that decision does not suggest any nefarious purpose. Rapold argues that "on May 18, Hunt and Parro made the decision not to hire [him]" and then later assured him that he would begin at Baxter on June 4. (Pl. Resp. at 5). But in fact, the undisputed facts suggest otherwise. Immediately after Rapold received his visa, Parro engaged in series of emails with Baxter SA personnel about terminating the consultancy agreement, paying Rapold the money Baxter owed him under that agreement, and selecting a start date. (Hunt Dep. at Ex. 6; Parro Dep. at Ex. 6). In fact, Parro indicated to Baxter SA that Baxter wished to pay Rapold a $45,000 bonus

beyond that which the consultancy agreement called for. (Parro Dep. at Ex. 6). Hunt wrote to Rapold on May 17, prior to the date he claims that she made the decision not to hire him, to provide him with language to terminate the consultancy agreement and even informed him that it would pay him a $45,000 bonus in addition to the amount owed under the consultancy agreement. Rapold, however, points to not a shred of evidence that Hunt hatched some Machiavellian plot to trick him into relinquishing his consultancy agreement with Baxter SA — one that could be terminated by mutual consent and one that existed for the purpose of allowing Rapold to begin his work prior to obtaining his visa.

Although the Court must draw reasonable inferences in Rapold's favor, it is not required to draw an unreasonable one. *Tindle v. Pulte Home Corp.*, 607 F.3d 494, 496 (7th Cir. 2010). Rapold's claim that Hunt outlined the reasons for his termination on May 18 and not May 25 plan and therefore that she intended to interfere with his contract and relationship with Baxter SA is just such an unreasonable inference. The undisputed facts show that Rapold and Baxter SA mutually agreed to terminate the consultancy agreement. Rapold can point to no intentional or unjustified interference with his contract or relationship. Nor can he demonstrate that Baxter induced Baxter SA to breach its contract with him.

The Court GRANTS Baxter's Motion for Summary Judgment on Counts I and II of Rapold's claim.

### B. *Fraudulent & Negligent Misrepresentation Claims*

Rapold's misrepresentation claims require very little discussion. In short, Rapold relies again on the May 18 date atop Hunt's notes to speculate that Baxter must have misrepresented to him that it would employ him beginning June 4. He argues that throughout his visit to Deerfield that ended

13

on May 20, Hunt assured him that his start date would be June 4, and the May 18 date on her notes therefore provides evidence of a fraudulent or negligent misrepresentation.

As noted earlier, however, the undisputed facts demonstrate that when Rapold received his visa, Parro began working on wrapping up the consultancy agreement and ensuring that Rapold received the amounts he was owed under that agreement — plus an additional $45,000 bonus. The undisputed facts further demonstrate that shortly thereafter Hunt received communication from Prudential concerning Rapold's behavior during his housing search. On May 22, a day after Rapold had terminated the consultancy agreement by mutual consent, Hunt first discussed the report with Parro and then sought permission from her supervisors to withdraw Baxter's offer of employment. None of these facts are in dispute — though Rapold quibbles with the Prudential agent's assessment of the dispute, he cannot and does not dispute that Hunt received a complaint from Prudential. Rapold simply points to no evidence that Baxter made the decision to terminate him prior to asking him to asking him to terminate the consultancy agreement.

The Court GRANTS Baxter's Motion for Summary Judgment on Counts III and IV of Rapold's claim.

C. *Promissory Estoppel*

To prove promissory estoppel, a plaintiff must establish, among other things, that the defendant made an unambiguous promise to him. *Chicago Limousine Serv., Inc. v. City of Chicago*, 355 Ill. App. 3d 489, 499, 781 N.E.2d 421 (Ill. App. Ct. 2002). Rapold argues that Baxter promised to employ him beginning June 4 if he terminated his consultancy agreement. Rapold's argument merits little discussion.

14

Baxter's offer to employ Rapold was an "at will" offer. While Baxter might have promised that Rapold would begin on June 4, nothing prevented Baxter from withdrawing that offer once it learned of conduct that made it reconsider that decision (or even for no reason at all). Rapold argues that promises of employment to "at will" employees are not ambiguous, citing *Brusilovsky v. Figgie Int'l*, No. 94 C 1506, 1995 U.S. Dist. Lexis 7341 (N.D. Ill. May 25, 1995). Rapold, however, misreads *Brusilovsky*. In *Brusilovsky*, the court considered whether testimony that the employer told the plaintiff that he would have a job as long as he liked was sufficient to transform an at-will employment contract into one for permanent employment. *Id.* at 12. *Brusilovsky* held that such promises were not sufficient to support promissory estoppel claims. *Id.* (citing *Eastman v. Chicago, Central & Pacific R.R. Co.*, 930 F.2d 1173 (7th Cir. 1991)). Instead, Illinois courts have held that without an offer of permanent or long-term employment an offer of at-will employment is not sufficient to support a promissory estoppel claim. *Robinson v. BDO Seidman, LLP*, 367 Ill. App. 3d 366, 368-370, 854 N.E.2d 767 (Ill. App. Ct. 2006).

The Court GRANTS Baxter's Motion for Summary Judgment on Count V of Rapold's claim.

D.  *National Origin Discrimination*

A plaintiff can prove a claim of national origin discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, using either the direct method or the indirect method. *Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 630 (7th Cir. 2009). Under the direct method, a plaintiff can survive summary judgment if he can demonstrate "'triable issues as to whether discrimination motivated the adverse employment action.'" *Id.* at 631 (quoting *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1114 (7th Cir. 2009)). A plaintiff can demonstrate triable issues using either direct or circumstantial evidence. *Id.*

15

Direct evidence, an admission by the decisionmaker for example, points directly to a discriminatory animus and is understandably rare. *Id.* A plaintiff who relies on circumstantial evidence must construct a "convincing mosaic" of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker. *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003). Circumstantial evidence can include, among other things, suspicious timing, ambiguous written or oral statements, or comments directed at other members of the protected group. *Id.* (citing *Troupe v. May Dep't Stores, Inc.*, 20 F.3d 734, 736 (7th Cir. 1994)). The circumstantial evidence must, however, point directly to a discriminatory reason for the adverse action. *Id.*

In this case, Rapold comes close to pointing to the proverbial "smoking gun." Almost from the start of the parties' relationship, Hunt began expressing concerns about Rapold's national origin. In a February 2007 memo, Hunt wrote that she had a concern regarding Rapold's "European cultural differences." In April 2007, Hunt spoke with Baxter's Chief Scientific Officer, Norbert Riedel, because he was German and asked him to "coach" Rapold on how better to fit into Baxter's culture. Later in April, Hunt wrote an email to Parro in Baxter's Human Resources department stating that many of Riedel might be able to solve Rapold's issues because he understood the "German" approach. Hunt testified at her deposition that because Rapold lived in Germany he had a "different way of viewing the world" and she compared that view to one shared by the "Mafia" and labeled it "autocratic." (Hunt Dep. at 66-67). Even when Baxter withdrew its offer of employment, Parro (who made the call with Hunt) told Rapold that Baxter believed there was a "cultural mismatch" and that he would not be able to succeed in the American business environment. And when Hunt wrote to her supervisors to inform them of her decision regarding Rapold, she told them that working with Rapold was difficult and that she attributed part of that difficulty to "culture." Hunt's and Parro's

statements fall short of an explicit statement that Baxter withdrew its offer of employment because Rapold's national origin, but they fall just short. Repeatedly, Hunt and Parro explain Rapold's behavior by attributing it to his heritage.

Baxter offers a number of arguments why Hunt and Parro's statements are not sufficient evidence to support an inference that Baxter acted with discriminatory intent, none of which are convincing.[2] Baxter's principal argument is that Hunt and Parro's statements do not directly point to a discriminatory intent.[3] Baxter compares Hunt and Parro's statements to those made by supervisors in other cases, notably *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691 (7th Cir. 2006) and *Naik v. Boehringer Ingelheim Pharm., Inc.*, No. 07 C 3500, 2009 WL 1607575 (N.D. Ill. Jun. 9,

---

[2] Some of Baxter's arguments in this regard are frivolous. For instance, Baxter suggests that Hunt and Parro's statements do not constitute "evidence" because Rapold never testified regarding the statements. *See* Reply at 9. Baxter seems to suggest either that Rapold would need to prove Baxter's intent through his own testimony and not through Hunt or Parro's, which makes no sense, or that because Hunt and Parro may not have communicated a discriminatory intent to Rapold means they did not harbor one, which also makes no sense. Indeed, one reason direct evidence of discriminatory intent is so rare is because employers typically are sufficiently savvy that they avoid informing employees that they harbor discriminatory motives. Baxter further argues that Hunt and Parro's statements are insufficient to stave off summary judgment because Rapold is *Swiss* and not German. *See* Reply at 10 (emphasis in original). Merely because Baxter's decisionmakers may have been ignorant of the differences between Switzerland and Germany or falsely attributed Germanic ancestry to Rapold does not mean a jury could not find that Baxter was motivated by a discriminatory intent. Finally Baxter also argues that Rapold himself attacked the "American 'consensus culture,'" as if to suggest that Rapold's poor response to its action excuses any discriminatory intent it had. These arguments warrant no further discussion.

[3] In its Reply, Baxter confuses direct evidence with the direct method. It argues there is no "direct evidence" and quotes the definition of direct evidence from *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 723 (7th Cir. 1998). Of course, as noted earlier, a plaintiff need not use "direct evidence" to proceed under the direct method. A plaintiff can use circumstantial evidence — from which a jury *can infer* a discriminatory motive. *See, e.g., Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 529-530 (7th Cir. 2009) (explaining difference between direct evidence and direct method); *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720 n.3 (7th Cir. 2005) (same) (collecting cases).

2009). The comments in *Ptasznik*, however, occurred five to six months prior to the termination decision and unlike here did not relate directly to that decision. *Naik* simply is not applicable as the court there considered whether an inquiry into the plaintiff's national origin was sufficient to demonstrate that other similarly situated employees outside the protected class were treated more favorably — a step in the indirect burden-shifting method — and not whether that inquiry evidenced circumstantial evidence of a discriminatory intent.

Still, Baxter attempts to point to the context in which Hunt made the statements concerning Rapold's national origin. It explains that her comments are directed more at Rapold's inability to fit within Baxter's team approach and not about his national origin. Baxter points to the fact that Rapold himself discussed with Hunt cultural differences that explained his problem-solving approach. As a result, Baxter argues, Hunt was not exhibiting a discriminatory animus but rather attempting to help Rapold "assimilate into Baxter's collaborative team culture" and accommodate Rapold's obstinate behavior. In other words, Baxter argues that a jury could infer that Hunt, by referencing Rapold's national origin, was attempting to help him, not to discriminate against him. That is one inference that a jury could draw, but certainly not the only inference. Of course, where a jury can choose between competing reasonable inferences, summary judgment is not appropriate. *Stokes v. Bd. of Educ. of the City of Chicago*, 599 F.3d. 617, 619 (7th Cir. 2010).

A jury could also infer that Hunt — who expressed concerns about Rapold's national origin from the infancy of his consultancy through her request to withdraw the offer of employment — believed that Rapold shared some immutable characteristic attributable to all Germans (and even Swiss). A jury could further infer that Hunt believed that Rapold could not correct the behavior because of his national origin and therefore refused to offer him the opportunity to improve that

18

Baxter might have offered to an employee without Rapold's ancestry. The fact of the matter is that Hunt repeatedly explained Rapold's behavior by attributing any negative act to his national origin, sometimes in practically pejorative terms, and ultimately informed her supervisors that Baxter should withdraw the offer of employment because of irreconcilable cultural differences. A jury could thus find that Baxter acted with discriminatory intent.

The Court DENIES Baxter's Motion for Summary Judgment on Count VI. IT IS SO ORDERED.

_____8/3/10_____          _____Wm. J. Hibbler_____
Dated       8-3-2010          Hon. William J. Hibbler
                              United States District Court